638 A.2d 1196

**MOUNT VERNON FIRE INSURANCE COMPANY**

v.

**SCOTTSDALE INSURANCE COMPANY, et al.**

No. 850, Sept. Term, 1993.

Court of Special Appeals of Maryland.

March 31, 1994.

**548**

Robert K. Nead (Sandra B. Minton and O'Doherty, Nead, Hoffman & Karey, on the brief), Baltimore, for appellant.

Linda S. Woolf (Sidney G. Leech and Goodell, DeVries, Leech & Gray, on the brief), Baltimore, for appellee, Scottsdale.

David A. Glauber (Glenn M. Cooper and Paley, Rothman, Goldstein, Rosenberg & Cooper, Chtd., on the brief), Bethesda, for appellee, Chantel, Chananie and Levitin.

Catherine A. Potthast (Smith, Somerville & Case, on the brief), Baltimore, for appellee, Empire.

M. Albert Figinski, Julie C. Janofsky, David W. Erb (Weinberg and Green, on the brief, Baltimore, for appellee, Allstate.

Argued before ALPERT, FISCHER and MURPHY, JJ.

MURPHY, Judge.

On October 5, 1987, Valerie McCree, on behalf of her son Napoleon Epperson ("Napoleon"), and Lynell McCree, on behalf of her children Donald Wilson, Jr. ("Donald") and Quanna Wilson ("Quanna"), filed a complaint against Chantel Associates ("Chantel") in the Circuit Court for Baltimore City. We shall refer to that lawsuit as the "*Epperson*" case. The complaint alleged that the plaintiffs were

tenant[s] of the defendant at 1224 West LaFayette Avenue ... and lived in the dwelling.... That ... the Defendant had either caused or allowed the continued existence on its interior walls, doors and woodwork of paint containing lead pigment and allowed said paint to chip and flake thereby rendering the building unsafe and dangerous and unfit for human habitation, especially for children of tender years.... During the time the infant plaintiff[s] resided in the dwelling, the infant[s] ingested and consumed paint containing lead and lead pigment thereby causing the infant to suffer the injuries, illness and infirmities hereinafter alleged.... the Plaintiff[s] on or about March, 1987 became seriously, painfully and permanently injured, ill and in-

firmed in head, body and limbs and suffered and will continue to suffer a severe and permanent shock to nerves and nervous system including great physical pain and mental anguish....

On February 2, 1989, the *Epperson* plaintiffs filed an "Amendment by Interlineation," adding negligence counts against David Chananie and Teresa Levitin, the owners of Chantel. These new counts alleged:

That the Plaintiff[s] on or about November 1986, became seriously, painfully and permanently injured, ill and infirmed in head, body and limbs and suffered and will continue to suffer a severe and permanent shock to nerves and nervous system including great physical pain and mental anguish....

On July 9, 1992, the *Epperson* plaintiffs filed a "Further Amendment by Interlineation," amending the complaint to include the following preamble:

Each of the Plaintiffs herein resided at various times at the 1224 W. Lafayette Avenue address owned and operated and managed by the Defendants. In September 1985 the Plaintiffs Napoleon Epperson and Donald Wilson, Jr. began to permanently reside there. The Plaintiff Quanna Wilson resided there from her birth in May 1986. From the beginning of the time that each child resided in the premises each was exposed to lead paint, lead chips and lead dust which were ingested in some manner by the children. Each, from the beginning of their residence was injured by this exposure, as the ingestion of lead began a process of cellular damage.

During the period of time that is relevant to this appeal, the following liability insurance policies provided coverage for 1224 West Lafayette Avenue:

1. Empire Indemnity Insurance Co. ("Empire") issued an "Owners', Landlords' and Tenants'" liability policy to Chantel that provided coverage from April 1, 1984 to April 1, 1985;

2. Mount Vernon Fire Insurance Co. ("Mount Vernon") issued an "Owners', Landlords' and Tenants' " liability policy to Chantel that provided coverage beginning on April 1, 1985 and ending on March 12, 1986;

3. Scottsdale Insurance Company ("Scottsdale") issued two consecutive "Owners', Landlords' and Tenants' " liability policies, the first beginning coverage on March 12, 1986 and ending on March 12, 1987, the second beginning coverage on March 12, 1987 and ending on March 12, 1988.

4. Allstate Insurance Company ("Allstate") issued a "Personal Umbrella" policy to Chananie and Levitin on February 10, 1983. That policy was renewed annually through February 10, 1993. It provided "excess" liability coverage for certain occurrences.

On April 22, 1991, Scottsdale filed a complaint in the Circuit Court for Baltimore City, seeking a declaration that Scottsdale's policy excluded coverage for the lead paint claims alleged by the *Epperson* plaintiffs. On October 8, 1991, Scottsdale amended its complaint, joining Allstate, Mount Vernon, and Empire and requesting that the insurer(s) who did have a duty to defend be ordered to reimburse Scottsdale for all attorneys' fees, costs, and expenses it had incurred to defend the *Epperson* case. On December 6, 1991, Chantel filed a counterclaim against Scottsdale and a crossclaim against Empire, Mount Vernon, and Allstate. According to Chantel, because the "occurrence of each child's bodily injury could not be determined from the *Epperson* pleadings, each company had a potentiality of coverage, and must therefore defend Chantel."

Every party to the declaratory judgment action, except the *Epperson* plaintiffs, filed a motion for summary judgment. Chantel, Chananie, and Levitin (hereinafter "Chantel") sought summary judgment against Empire, Mount Vernon, and Allstate on the basis of an affidavit prepared by a psychologist named Stephen R. Schroeder, who stated:

> Lead is a poison that affects virtually every system in the body, it is especially harmful to the developing brain and nervous systems of fetuses and young children....
>
> \* \* \* \* \* \*
>
> .... There is general agreement that human infants and toddlers below the age of three years are at special risk because of *in utero* exposure, increased opportunity for exposure because of normal mouthing behavior of lead-containing objects, and increased rate of lead absorption due to various factors, e.g., iron and calcium deficiencies. Cumulative exposure has many central nervous system effects relatively immediately. These effects can accumulate and children show great variability in their response to different amounts of lead ingestion. Thus they may be suffering from the effects of cumulative low level lead exposure years before they are clinically observable.
>
> Thus, it is my opinion within a reasonable degree of scientific probability that exposure to lead produces both direct and indirect damage to the cells, tissues and organs of the body that begin immediately or shortly after exposure, notwithstanding the fact that the symptoms, especially at low levels of exposure, may not be apparent until much later, sometimes years after exposure.

On August 17, 1992, after a hearing on all of the motions for summary judgment, the circuit court granted Scottsdale's motion, stating:

> Now with regard ... to Scottsdale ... that policy clearly had an exclusion for both indemnification and the defense of any lead paint suit. And that was, I think, clearly the understanding between the parties.... [Chananie and Levitin] were told by their insurance agent that [lead paint coverage] couldn't be obtained, so they were aware of the fact that they were getting a policy from Scottsdale that had a lead paint exclusion.
>
> .... But I could go beyond that on the facts of this case and say that it is clear that the diagnoses, which would be the manifestation of the injuries, occurred during the period

of the first policy of, indeed, in the case of the minor Napoleon it occurred on March 3rd, 1986 which was some nine days before the first policy.

.... [U]nder the facts that are uncontradicted the manifestations of the injury occurred during the period or prior to the first policy.

So I will grant Scottsdale's motion for summary judgment.

The circuit court also granted Empire's motion, stating:

[C]learly, the policy expired on April 1, 1985, Empire cannot possibly be responsible because nothing occurred, they weren't even ... living in the premises in two cases and they weren't born yet in the third case during the policy period.

So I'm going to grant Empire's motion for summary judgment.

The circuit court concluded that Mount Vernon had a duty to defend and to indemnify because Mount Vernon

had a policy from April 1 of 1985, ran to April 1, 1986 but was cancelled on March 12, 1986. And here two of the children ... Napoleon and Donald, were residing in the premises during the period of time that that policy was in effect. And Quanna is born some two months afterwards.

Napoleon, the manifestation of his illness which is borne out by the diagnosis was March 3, 1986 which is during the policy period.

For Donald it's March 14, 1986 which is two days after the policy terminated.

And for Quanna was January 29, 1987 some months later.

But the exhibits that have been given to the Court by Chantel in it's motion for summary judgment include the affidavit of Dr. Stephen R. Schroeder, and Dr. Schroeder's affidavit which is not contradicted by any other affidavits is that, and I'm quoting:

"Exposure to lead produces both direct and indirect damage to the cells tissues and organs of the body that begin immediately or shortly after exposure. Notwithstanding

the fact that the symptoms especially at low level of exposure may not be apparent until much later, sometimes years after the exposure.["]

There is also ... that the exposure to lead can affect even children in utero....

.... [T]here is no affidavit in opposition to Dr. Schroeder's affidavit and that is sufficient to bring the children within the period of time that Mt. Vernon had the policy....

Mt. Vernon.... is responsible for the defense and indemnification.

Finally, with regard to Allstate, the circuit court ruled:

[T]here is ... an exclusion for Allstate that they do not have to defend when there is the underlying policy. In this case I found that there is an underlying policy, Allstate does not have to defend. Allstate will be required to indemnify to the extent that there is any recovery above the basic underlying coverage.

... I'll make it clear that the [Allstate] homeowner's policy does not come into play in this situation, and I would grant the Allstate motion with regard to the homeowner's policy; deny it as to the [personal umbrella policy]. And grant Chantel's motion as to Allstate.

Subsequent to these rulings, Chantel filed a motion requesting that Mount Vernon and Allstate be ordered to pay Chantel's attorney's fees incurred both in the declaratory judgment action and in the *Epperson* case. Scottsdale then filed a motion requesting that Mount Vernon be ordered to pay Scottsdale's attorneys' fees and costs incurred in both the *Epperson* litigation and in the declaratory judgment action. Finally, Empire filed a motion requesting that Mount Vernon be ordered to pay Empire's attorneys' fees and costs incurred in the declaratory judgment action.

At the conclusion of a hearing on all open motions, the circuit court (1) denied Mount Vernon's motion for reconsideration of the August 17, 1992 rulings; (2) ordered Mount Vernon to pay all of the attorneys' fees, costs, and expenses

incurred by Chantel in the defense of the "lead-related personal injury claims" and in the prosecution of the coverage dispute; (3) ordered Mount Vernon to pay attorneys' fees, costs, and expenses incurred by Scottsdale in defending the "lead-related personal injury claims;" and, (4) denied the requests of Empire and Scottsdale for reimbursement of attorneys' fees and costs they incurred while litigating the coverage issue. All claims for reimbursement from Allstate were dismissed without prejudice.

Mount Vernon presents the following issues for our review:

I. Whether the Court below erroneously concluded that Mount Vernon had a duty to defend and indemnify Chantel for claims made in the underlying *Epperson* lawsuit.

II. Whether the Court erred in ruling as a matter of law that there was no dispute as to any material fact.

III. Whether the Court erred in considering a non-medical affidavit which offered conclusions as to medical findings and whether the Court further erred in finding that the affidavit created potential coverage when there was no factual evidence or claim.

IV. Whether the Court below erroneously awarded costs and attorneys fees for defense in the underlying action and for defense in the declaratory action.

Scottsdale presents the following issue:

V. Whether the court below erred in not ordering Mt. Vernon to reimburse Scottsdale for the attorneys' fees and costs incurred by Scottsdale in bringing this declaratory judgment action.

Empire presents the following issue:

VI. Should Mount Vernon be required to reimburse Empire's costs and attorneys' fees incurred in this declaratory proceeding?

We shall address each of these issues as we explain why we have reached the following conclusions:

Mount Vernon has a duty to defend Chantel against the claims made on behalf of Donald and Napoleon, but not against the claim made on behalf of Quanna. That limited duty to defend did not arise, however, until July 9, 1992.

The extent of Mount Vernon's duty to indemnify cannot yet be resolved. The circuit court should not have entered a judgment on that issue.

Mount Vernon's limited duty to defend makes it obligated to pay for some of the litigation expenses incurred by Chantel. A remand is necessary to determine the extent of that obligation.

Mount Vernon does not have an obligation to reimburse either Scottsdale or Empire.

I.

### (a) The Exclusive Pleading Rule Establishes Mount Vernon's Duty to Defend

The issue of whether an insurance company owes a duty to defend its insured against a particular lawsuit is resolved by application of the exclusive pleading rule:

> "The exclusive pleading rule holds that an insurer's defense obligation is determined solely by the allegations against the insured in the claimant's pleadings."

Andrew Janquitto, *Insurer's Duty to Defend in Maryland,* 18 U.Balt.L.Rev. 1, 7 (1988). *See also Eastern Shore Financial v. Donegal Mutual Ins.,* 84 Md.App. 609, 624, 581 A.2d 452 (1990), *cert. den. sub nom. Insley v. Old Guard Mut. Ins. Co.,* 322 Md. 131, 586 A.2d 13 (1991); *Cochran v. Aetna Casualty and Surety Company,* 99 Md.App. 350, 512, 637 A.2d 509 (1994). This rule has been called several different names, the most accurate of which may be the "eight corners rule" because resolution of the duty to defend issue actually requires an examination of what is contained within the four

corners of the insurance policy *and* what is contained within the four corners of the complaint.[1]

In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit.

*St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 193, 438 A.2d 282 (1981). Even if the complaint does not allege enough facts to establish whether the claim is or is not covered, the insurer has a duty to defend. It is the potential for coverage that creates the duty to defend. *U.S.F. & G. v. Nat. Pav. Co.*, 228 Md. 40, 54, 178 A.2d 872 (1962). In *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975), proof that an insured had been charged with assault, and evidence that he had entered a guilty plea to that misdemeanor, did not establish as a matter of law that the insured had committed an intentional tort. The insurer's obligations had to be "determined by the allegations in the tort actions." *Id.* at 407, 347 A.2d 842.

The exclusive pleading rule is easy to apply and serves an important public interest. A duty to defend issue should be resolved promptly and without litigation. In most cases, those goals are achieved by applying the exclusive pleading rule. The case before us, however, is complicated by (1) various amendments to the *Epperson* complaint, each of which

---

1. Counsel in this case have argued their positions in terms of the "eight corners rule." That characterization places as much emphasis on the insurance policy as on the complaint. We recognize that there are situations in which it may be preferable to frame the issue in terms of the "eight corners rule." This case, however, does not involve a dispute about the meaning of language contained in an insurance policy. We shall therefore continue to use the term "exclusive pleading rule."

has asserted different dates of injury; (2) a dispute over whether the plaintiffs were actually injured during the period of time in which Mount Vernon was providing coverage; and (3) a dispute over whether the circuit court could consider the Schroeder affidavit on the issue of when the plaintiffs were injured.

In Part III of this Opinion, we shall explain why the circuit court should not have considered the affidavit when deciding the duty to defend issue. In Part I(b) of this Opinion, we shall explain why Mount Vernon must be given an opportunity to prove that it (a) does not have any duty to indemnify, or (b) does not have an exclusive duty to indemnify. We first apply the exclusive pleading rule to the *Epperson* complaint, as most recently amended. Under that rule, Mount Vernon does have a limited duty to defend.

Its insurance contract with Chantel obligates Mount Vernon to

> pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> A. bodily injury or
>
> B. property damage
>
> to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental thereto, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent. . . .

The following definitions and limitation of liability appear in the Mount Vernon policy:

> **"bodily injury"** means sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.

*　　*　　*　　*　　*　　*

"**occurrence**" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured....

&ast; &ast; &ast; &ast; &ast; &ast;

For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

■ The injuries alleged by the *Epperson* plaintiffs are "bodily injuries" potentially covered under Mount Vernon's policy. The circuit court therefore ruled correctly as a matter of law that Mount Vernon does have a duty to defend. Mount Vernon's duty did not arise, however, until it obtained notice of Epperson's July 9, 1992 amended complaint. Moreover, Mount Vernon's duty to defend is limited to the claims presented by Donald and Napoleon. It does not have a duty to defend Chantel for the claims brought on Quanna's behalf because the July 9, 1992 amendment asserts that each child "from the beginning of their residence was injured by this exposure." Quanna did not "reside" at 1224 W. Lafayette Avenue before her birth in May, 1986.[2]

We are persuaded that nothing in the pleadings triggered Mount Vernon's duty to defend before the *Epperson* plaintiffs filed a "Further Amendment by Interlineation" on July 9, 1992. Chantel argues that the phrases "at or about," "subsequently became ill," and "has required extensive and continuous medical care and treatment," were contained in the original *Epperson* complaint, and that those general phrases raise

---

2. The Court of Appeals has recognized that, "in the case of a viable child, such child [has] a cause of action when born alive, arising out of a prenatal injury due to the negligent act of a third person." *State, Use of Odham v. Sherman*, 234 Md. 179, 183, 198 A.2d 71 (1964), *citing Damasiewicz v. Gorsuch*, 197 Md. 417, 440–441, 79 A.2d 550 (1951). There has been no allegation, however, that Quanna suffered any prenatal injury.

a potentiality for coverage under the policy, and thus a duty to defend. We do not agree with that argument. In this case, neither the complaint nor the first three amendments thereto alleged that the plaintiffs' injuries occurred prior to the date on which Mount Vernon's policy expired.

In *Harford Mut. Ins. v. Jacobson*, 73 Md.App. 670, 536 A.2d 120 (1988), we held that the pleadings contained enough information to indicate a potentiality that the injury occurred during the insurer's policy period. That case also involved a declaratory action to determine an insurer's duty to defend an underlying lawsuit that alleged lead-paint poisoning. The complaint in the underlying action alleged that the plaintiff "has required extensive and continuous medical care, attention and treatment" and "the plaintiff is still receiving treatment." 73 Md.App. at 676, 536 A.2d 120. It was undisputed, however, that during the policy period: (1) the underlying complaint was filed; (2) the plaintiff's need for "extensive medical care and treatment" became apparent; and (3) the insured was charged with a violation of city health laws and ordered to eradicate lead chips from the leased premises. *Jacobson* is distinguishable on its facts. In this case, under either the "manifestation" trigger or the "exposure" trigger, the *Epperson* pleadings did not establish Mount Vernon's duty to defend until July 9, 1992. As of that date, however, Mount Vernon did have a duty to defend the claims presented by Donald and Napoleon.

### (b) The Exclusive Pleading Rule Does Not Establish Mount Vernon's Duty to Indemnify

The circuit court also ruled that Mount Vernon had a duty to indemnify Chantel for any liability that stems from the *Epperson* litigation. We cannot affirm that ruling on this record. Whether—and the extent to which—Mount Vernon has a duty to indemnify Chantel cannot be decided as a matter of law.

In *Mitchell v. Maryland Casualty*, 324 Md. 44, 595 A.2d 469 (1991), the Court of Appeals held that when the

underlying tort claims involve exposure to asbestos, an insurer's duty to defend is triggered by a person's exposure to the insured's products during the policy period. In *Harford County v. Harford Mut. Ins.*, 327 Md. 418, 610 A.2d 286 (1992), the Court of Appeals held that when the underlying tort claims involve environmental pollution, an insurer's duty to defend is triggered upon discharge of the pollution during the policy period. According to appellees, these cases hold that, in a lead-paint poisoning case, the insurer at the moment of the plaintiff's first exposure has the exclusive duty to indemnify. We do not agree with that interpretation. Allegations of injury due to initial exposure during the policy period (1) triggers the duty to defend and (2) creates a rebuttable presumption that any injury found to have occurred did occur during the policy period.

On the indemnification issue, however, the carrier that is obliged to defend must be given an opportunity to prove that (1) it has no obligation to indemnify because the injuries actually occurred at a time when it did not provide coverage; or (2) its obligation should be shared by the insured or by other carriers who provided coverage during the period of time in which the plaintiffs' injuries were aggravated by continued exposure. Whether and/or the extent to which the plaintiffs' injuries are covered under Mount Vernon's policy cannot be resolved until after the *Epperson* case has proceeded to judgment. No duty to indemnify arises until the *Epperson* plaintiffs have obtained a judgment against Chantel. Summary judgment on the duty to indemnify issue was therefore inappropriate. *Brohawn v. Transamerica Inc. Co., supra,* 276 Md. at 405, 347 A.2d 842.

If Chantel is found to be liable for the *Epperson* plaintiffs' injuries, after a final judgment has been entered in the *Epperson* case, Allstate, Chantel, and Mount Vernon shall all be entitled to present evidence on the issues of (1) when the *Epperson* plaintiffs first suffered bodily injury from lead paint ingestion, and (2) whether those injuries were aggravated during a period of time when Mount Vernon did not supply

coverage. Consistent with the principles established in *Ins. Co. of North America v. Forty–Eight Insulations,* 633 F.2d 1212, 1225 (1980), *cert. den.* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) and *Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1393 (E.D.N.Y.1988), Mount Vernon must shoulder the burden of persuasion on the issue of whether and/or how much it must indemnify Chantel.

There is a rebuttable presumption that the carrier who has the primary duty to defend also has the exclusive duty to indemnify. Therefore, as to any judgment entered in favor of Donald or Napoleon, Mount Vernon shall have the opportunity to prove by a preponderance of evidence that it is (1) not obligated to indemnify Chantel and/or (2) obligated to make only a partial indemnification.

## II.

We reject Mount Vernon's contention that the circuit court erred by granting summary judgment in favor of Empire and Scottsdale. Empire's policy expired before the *Epperson* plaintiffs moved into 1224 W. LaFayette Avenue. Scottsdale's policy contained an exclusion for lead paint liability.

## III.

Mount Vernon contends that the circuit court should not have considered the affidavit of psychologist Stephen R. Schroeder. We agree. On the duty to defend issue, the exclusive pleading rule precludes consideration of that affidavit. On the duty to indemnify issue, for reasons we explained in Part I, the affidavit does not address all of the material issues.

It has been argued that the exclusive pleading rule has been abolished by *Harford County v. Harford Mut. Ins., supra,* wherein the Court of Appeals stated:

The insurer must defend its insured if it appears from the suit or other sources available at the time defense is tendered that there is a potential of liability under the policy.

*See Mitchell, supra,* 324 Md. at 62, n. 4, 595 A.2d 469; *Continental Casualty v. Board of Educ.,* 302 Md. 516, 528, 489 A.2d 536 (1985); *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 347 A.2d 842 (1975).

327 Md. at 436 n. 6, 610 A.2d 286.

We recognize that in *Mitchell v. Maryland Casualty, supra,* the Court of Appeals relied on a pathologist's affidavit, attached to the appellant's motion for partial summary judgment, and a clinician's affidavit attached to the appellee's response. In that case, however, there was "no disagreement [in the affidavits] that the inhalation and retention of asbestos fibers may cause immediate harm to the cells and tissues of the lung." 324 Md. at 61, 595 A.2d 469.

We conclude that these cases do not abolish the exclusive pleading rule. They merely recognize that the court is not required to play the ostrich when uncontroverted evidence makes it clear that the exclusive pleading rule should not be applied. If there is no dispute about the truth of facts asserted in the "other sources," the court may rely on those undisputed assertions to determine whether there is a duty to defend. If there is a reasonable dispute[3] about the truth of facts asserted in the "other sources," the court must resolve the duty to defend issue by examining the four corners of the complaint and the four corners of the policy. In this case, it was the July 9, 1992 amendment to the *Epperson* complaint that triggered Mount Vernon's duty to defend the claims of Donald and Napoleon.

## IV, V, & VI.

Mount Vernon contends that it should not be obligated to pay the costs and attorneys' fees incurred by Chantel and Scottsdale for defense of the *Epperson* case, or for the attor-

---

**3.** The exclusive pleading rule does not prevent the court from taking judicial notice of (a) facts that are so well known that every reasonable person who resides in the jurisdiction of the court can be presumed to know them, or (b) facts that are capable of accurate determination by resort to sources whose accuracy cannot reasonably be questioned.

neys' fees incurred by Chantel in the declaratory action. Empire and Scottsdale contend that the circuit court erred when it denied their requests for attorneys' fees, costs, and expenses incurred in the declaratory judgment action.

The Court of Appeals has established two basic principles:

[A]n insurer is liable for the damages, including attorneys' fees, incurred by an insured as a result of the insurer's breach of its contractual obligation to defend the insured against a claim potentially within the policy's coverage, and this is so whether the attorneys' fees are incurred in defending against the underlying damage claim or in a declaratory judgment action to determine coverage and a duty to defend.

*Bankers & Ship. Ins. v. Electro Enter.*, 287 Md. 641, 648, 415 A.2d 278 (1980).

"The obvious converse proposition is that if the insurer's refusal to defend was not wrongful, it is not liable for attorneys' fees."

*Northern Assurance Co. v. EDP Floors*, 311 Md. 217, 232, 533 A.2d 682 (1987).

Mount Vernon did not have any duty to defend Chantel until it received notice of Epperson's "Further Amendment by Interlineation." Chantel is therefore not entitled to reimbursement from Mount Vernon for any attorneys' fees, costs and expenses that were incurred before July 9, 1992. Chantel is entitled to reimbursement for the reasonable and necessary expenses it incurred after July 9, 1992 in order to (1) defend itself against the claims of Donald and Napoleon, and (2) prosecute the declaratory judgment action against Mount Vernon. A remand is necessary to calculate the precise amount of Mount Vernon's obligation to Chantel.

In *Travelers Indem. v. INA,* 69 Md.App. 664, 680, 519 A.2d 760 (1987), we stated that

the cost of prosecuting a declaratory action against a recalcitrant insurer has been "authorized" by its refusal to

defend whether the declaratory action is brought by the insured or the defending insurer. . . .

\* \* \* \* \* \*

.... [W]e believe the package of rights to which a defending insurer is subrogated includes the insured's right to recover the cost of prosecuting a declaratory action against an insurer declared to have wrongfully refused to provide a defense.

 To obtain reimbursement of attorneys' fees from the carrier who does have the duty to defend the insured, the party seeking reimbursement must prove that the fees at issue (1) were incurred at a time when the carrier did have a duty to defend, and (2) were reasonable and necessary to force the carrier to do its duty.

 We hold that Mount Vernon is not responsible for any of Scottsdale's attorneys' fees. On the basis of its lead-paint exclusion, Scottsdale could have instituted a declaratory judgment action immediately after the *Epperson* case was filed. Scottsdale therefore should have been out of the Epperson case before Mount Vernon had a duty to defend. We reverse the circuit court's ruling that Mount Vernon be held responsible for the attorney's fees incurred by Scottsdale in the Epperson case.

 We hold that Mount Vernon is not responsible for any of Empire's costs and fees. We express no opinion, however, about whether any other party should have been required to reimburse Empire. Empire did not "stand in the shoes" of Chantel, and was not subrogated to Chantel's claim for these fees and costs. *Travelers Indem., supra,* 69 Md.App. at 679–680, 519 A.2d 760. Moreover, we have explained above why Mount Vernon's duty to defend Chantel is limited in two respects. Under these circumstances, Empire is not entitled to reimbursement from Mount Vernon.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PRO-CEEDINGS NOT INCONSISTENT WITH THIS OPINION;**

COSTS TO BE PAID ½ BY APPELLANT, ⅛ BY APPEL-
LEE CHANTEL, ⅛ BY APPELLEE ALLSTATE, ⅛ BY
CROSS–APPELLANT EMPIRE, AND ⅛ BY CROSS–AP-
PELLANT SCOTTSDALE.